No. 94-437

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

GALLATIN COUNTY, acting by and
through the County Commissioners,

Relators,

v.

MONTANA EIGHTEENTH JUDICIAL DISTRICT COURT,
Gallatin County; HONORABLE LARRY W. MORAN,
Presiding Judge,

Respondents.

ORIGINAL PROCEEDING

COUNSEL OF RECORD:

For Appellant:

James T. Harrison, Jr. (argued); Harrison, Loendorf
& Poston, Helena, Montana

A. Michael Salvagni, Gallatin County Attorney,
Bozeman, Montana

For Respondent:

James H. Goetz, Attorney at Law (argued), Brian
Gallik, Attorney at Law, Bozeman, Montana

Submitted:  October 17, 1996

Decided: January 3, 1997
Filed:


_____
Clerk


Justice Karla M. Gray delivered the Opinion of the Court.


This case originated in this Court on the application of relator Gallatin County for a writ of supervisory control seeking relief from the Order to Provide Facilities issued by the Honorable Larry W. Moran, Eighteenth Judicial District Court, Department II, Gallatin County, in August of 1994.  The Order directed the Gallatin County Sheriff (Sheriff) to take possession of a specified area on the second floor of the Gallatin County Law and Justice Center (Center) for use as a jury room and to obtain the necessary architectural and construction services to remodel the area.  It also ordered that, after certification by Judge Moran, the costs for all related services would be paid out of the Gallatin County general fund.

Gallatin County requested that we accept jurisdiction to protect it from participating in extended and needless litigation and that we dismiss and declare void Judge Moran's Order to Provide Facilities on the grounds that Judge Moran lacked authority to issue it.  The respondents, the Eighteenth Judicial District Court and Judge Moran (collectively, Judge Moran), agreed that we should accept supervisory control, but contended that we should then refer the case to a neutral district court judge for creation of an evidentiary record and resolution of factual issues.

An original proceeding in this Court for a writ of supervisory control, or other remedial writ or order, is "sometimes justified by circumstances of an emergency nature, as when a cause of action or a right has arisen under conditions making due consideration in the trial courts and due appeal to this court an inadequate remedy. . . ."  Rule 17, M.R.App.P.  Supervisory control is appropriate when constitutional issues of major statewide importance are involved, the case involves purely legal questions of statutory and constitutional construction, or urgency and emergency factors exist, making the normal appeal process inadequate.  See Plumb v. Fourth Judicial District Court (November 22, 1996), No. 96-023, slip op. at 8-9.

We concluded that supervisory control was appropriate in this

case because of the statewide importance of the legal issue presented: namely, whether Judge Moran had authority--pursuant to statute or the Montana Constitution--to issue the Order to Provide Facilities under the circumstances extant at the time. Moreover, it was clear that urgency and emergency factors existed, not the least of which was the interest of the Gallatin County taxpayers in avoiding extended litigation beginning at the trial court level. Thus, we accepted original jurisdiction.

We also determined that an evidentiary hearing before a neutral district court judge was necessary to develop a factual record and more clearly define the legal issues. To that end, we ordered the parties to agree in writing on a district court judge to assume jurisdiction and hold an evidentiary hearing. We instructed the agreed-upon judge to determine the "suitability" of both the jury room facilities proposed by Gallatin County on the third floor of the Center and the alternative facilities ordered by Judge Moran on the second floor, and to file findings of fact and conclusions of law.

The Honorable Kenneth R. Wilson subsequently assumed jurisdiction. Judge Wilson held a hearing at the Center on February 2 and 3, 1995, and, thereafter, filed findings and conclusions with this Court.

Judge Wilson found that the current jury room facilities utilized by Judge Moran on the second floor of the Center are "totally unsuitable" for a number of reasons, which we discuss later. He further found that Gallatin County's proposal to put Department II's jury room facilities on the third floor did not adequately address the problems with the current facilities, primarily due to the distance between Department II's courtroom on the second floor of the Center and the proposed third-floor site for the jury room. Finally, Judge Wilson found that Judge Moran's request for jury room facilities on the second floor was reasonable, would address the problems with both the current jury room and the Gallatin County proposal, and could be accomplished for a nominal renovation expense. On those bases, Judge Wilson concluded--although the conclusion was denominated a finding--that Judge Moran's Order to Provide Facilities was authorized by, and within the purview of, 3-5-404, MCA.

After Judge Wilson's findings and conclusions were filed with this Court, the parties briefed and orally argued the issues. Both Gallatin County and Judge Moran addressed Judge Moran's authority to issue the Order to Provide Facilities under 3-5-404, MCA, and the Montana Constitution. Because we hold that 3-5-404, MCA, authorized Judge Moran's Order to Provide Facilities, we need not address in this case the tension between a court's inherent authority and the constitutional separation of powers between the judicial and legislative branches of government.

We address the following issues:

1. Did Judge Moran have authority pursuant to 3-5-404, MCA, to issue the Order to Provide Facilities?

2. Are Judge Wilson's findings of fact regarding the suitability of Department II's existing jury room, the third-floor space designated by Gallatin County, and the second-floor space designated in Judge Moran's Order clearly erroneous?

## FACTUAL BACKGROUND

The Center is a three-story building in Bozeman, Montana, which houses the courtrooms and chambers for Departments I and II of the Eighteenth Judicial District Court. The courtroom and chambers for Department I, the Honorable Thomas A. Olson (Judge Olson) presiding, are located on the third floor; Judge Moran's courtroom and chambers for Department II are on the second floor. The Clerk of the District Court, County Attorney, Sheriff and Youth Probation offices also are located in the Center. The Sheriff's office previously was located on the second floor across from Judge Moran's courtroom and it is that office space which Judge Moran ordered taken and remodeled for use as the Department II jury room.

Department II has been located on the second floor of the Center since approximately 1980, when the Honorable Joseph Gary (Judge Gary), Judge Moran's Department II predecessor, was presiding. Since taking office in August of 1989, Judge Moran has considered the current jury room facilities grossly inadequate.

Department II's facilities include Judge Moran's chambers, a courtroom, an office for the court reporter and a jury room. The jury room is windowless and measures approximately fourteen by eighteen feet. It also serves as the office for Judge Moran's law clerk who, at all times pertinent to this case was Helene Orenstein (Orenstein), and as a mediation and settlement conference room. The room contains file cabinets, Orenstein's computer work center, a refrigerator and a table and chairs for jurors. Juror bathroom facilities open directly onto the jury deliberations area; the bathroom facilities do not comply with standards required by the Americans with Disabilities Act (ADA).

The Center was severely damaged by a fire in September of 1990 and Gallatin County received insurance proceeds for the fire damage. Gallatin County intended to remodel the Center with the insurance proceeds and money from the City of Bozeman which, combined, totaled approximately $1,400,000. Architect Don McLaughlin (McLaughlin) subsequently facilitated an architectural charrette in early 1992 to discuss and plan the remodeling of the fire-damaged Center. Departments I and II were represented by H.P. "Butch" Goan who, at the time of the charrette, was the Gallatin County court administrator. Judge Moran also attended the charrette and the problems with Department II's jury room were discussed. Gallatin County Commissioner David Pruitt (Pruitt) attended the charrette and participated in the planning on behalf of the County Commissioners (Commissioners).

The first set of plans developed by McLaughlin after the charrette included a new, and substantially larger, jury room for Department II located on the second floor of the Center. The plans also included a separate mediation room which would have alleviated the multiple use problem of the existing jury room. Judge Moran indicated that the proposed changes to Department II's facilities were acceptable.

The first set of plans was abandoned in January of 1993 because the cost of the proposed renovations greatly exceeded the amount of money available for the remodeling project. McLaughlin developed a new set of plans which eliminated the proposed improvements to Department II's facilities and a bid was accepted on the new plans in May of 1993. Judge Moran first learned of the new plans in late May of 1993 when he read in the Bozeman newspaper that a bid had been accepted for remodeling the Center. Immediately thereafter, he also learned that all of the Department II improvements had been eliminated from the remodeling plans.

Judge Moran wrote a letter to Pruitt, dated June 1, 1993, expressing his dissatisfaction with the final plans and with the "continuing unacceptable facilities provided [Department] II." He conveyed his opinion that moving Department II's current jury room to the space directly across the hall--specifically, the space being vacated by the Sheriff's office--would be the most economical way to remedy the problems with the existing jury room facilities. The Commissioners responded that the space Judge Moran proposed as Department II's new jury room had been allocated for expansion of the County Attorney's office.

Judge Moran learned in late June of 1993 that the County Commissioners would be allocating Department II space on the third floor of the Center for use as a jury room. He informed the Commissioners that such a location was unacceptable as a solution to the problems with the existing jury room.

The Commissioners sent Judge Moran a letter dated August 22, 1994, informing him that they had consulted with various district court judges in Montana and been assured that placing a jury room on a different floor than the courtroom, and having the jury walk from one floor to another, did not create a problem. The Commissioners advised Judge Moran that a suitable room was available on the third floor of the Center for Department II's jury room. Judge Moran issued the Order to Provide Facilities two days later and this action followed. Additional facts are set forth below where necessary for resolution of the issues.

DISCUSSION

1. Did Judge Moran have authority pursuant to 3-5-404, MCA, to issue the Order to Provide Facilities?

Section 3-5-404, MCA, provides:

When sheriff to provide facilities. (1) If suitable rooms for holding the district court and chambers of the judge

of said court be not provided in any county by the board of county commissioners thereof, together with the attendants, furniture, fuel, lights, and stationery sufficient for the transaction of business, the court or the judge thereof may direct the sheriff of the county to provide such rooms, attendants, furniture, fuel, lights, and stationery.

(2) The expenses incurred, certified by the judge to be correct, are a charge against the county treasury and must be paid out of the general fund thereof.

By its terms, this legislative enactment authorizes a district court judge to order a county sheriff to provide suitable facilities for holding court where such facilities have not been provided by the county commissioners. Whether the statute authorized Judge Moran's Order to Provide Facilities, under the circumstances present in this case, turns initially on the meaning of the word "suitable" in  3-5-404(1), MCA.

In interpreting a statute, we look first to the plain meaning of the words it contains. Clarke v. Massey (1995), 271 Mont. 412, 416, 897 P.2d 1085, 1088. Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation. Clarke, 897 P.2d at 1088. "In the search for plain meaning, 'the language used must be reasonably and logically interpreted, giving words their usual and ordinary meaning.'" Werre v. David (1996), 275 Mont. 376, 385, 913 P.2d 625, 631 (citing Gaub v. Milbank Ins. Co. (1986), 220 Mont. 424, 427, 715 P.2d 443, 445 (quoting In re Matter of McCabe (1975), 168 Mont. 334, 339, 544 P.2d 825, 828)).

The usual and ordinary meaning of the word "suitable" is "adapted to a use or purpose . . . appropriate from the viewpoint of propriety, convenience, or fitness . . . ." Webster's Third New International Dictionary, 2286 (1971). Similarly, Black's Law Dictionary, 1434 (6th ed. 1990) defines "suitable" as "[f]it and appropriate for the end in view." We conclude that, according to the plain meaning of the language used in  3-5-404, MCA, Judge Moran had authority to issue the Order to Provide Facilities if the Commissioners failed to provide a room "fit and appropriate" for use as the Department II jury room.

Gallatin County does not dispute that "suitable" ordinarily means "fit and appropriate for the end in view." It argues that, unless we construe "suitable" to mean "necessary" in the context of this statute,  3-5-404, MCA, violates the constitutionally-mandated separation of powers between the judicial and legislative branches of government by allowing courts to intrude too far into the budgeting and taxing provinces of the legislative branch.

We agree with Gallatin County that Article III, Section 1 of the Montana Constitution expressly prohibits a person charged with the exercise of power properly belonging to one branch of

government from exercising any power properly belonging to another branch. Article III, Section 1 does not apply here, however, where the Montana legislature has exercised its own constitutional power and prerogative to enact laws for the State of Montana by enacting 3-5-404, MCA, and affirmatively choosing to use the word "suitable" therein. Judge Moran did not expand the inherent authority vested in the judicial branch of government when he relied on 3-5-404(1), MCA, in issuing his Order; he merely acted pursuant to the authority expressly granted to the judiciary by the Montana legislature.

Moreover, Gallatin County's argument that we must construe "suitable" to mean "necessary"--notwithstanding the plain and undisputed ordinary meaning of "suitable"--invites this Court to overstep the bounds imposed on us by the constitutional separation of powers. Our role in interpreting statutes is "to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has inserted." Section 1-2-101, MCA. To accept Gallatin County's interpretation of "suitable" as meaning "necessary" would require us to contravene our role in interpreting statutes by omitting the word "suitable" which the legislature chose to use in 3-5-404(1), MCA, and inserting the word "necessary." Such an action properly could be taken by the legislature; it cannot be taken by this Court.

Finally, Gallatin County relies on Butte-Silver Bow Local Gov't v. Olsen (1987), 228 Mont. 77, 743 P.2d 564, for the proposition that Judge Moran was required to exhaust all legislative branch budgeting procedures before issuing the Order to Provide Facilities. Its reliance is misplaced.

In Olsen, we addressed the nature and extent of the inherent power of the courts. In the context of a district court judge's order to compel funding of increased salaries for court staff, we applied the following two-part test from State ex rel. Hillis v. Sullivan (1913), 48 Mont. 320, 137 P. 392: (1) whether an emergency has arisen; and (2) whether the established methods for providing funding have failed. Olsen, 743 P.2d at 566. Neither the Sullivan test nor our Olsen decision is applicable here, however, because we are not addressing whether Judge Moran's Order was within the inherent power of a court. On the contrary, if the circumstances set forth in 3-5-404, MCA, existed, Judge Moran acted pursuant to an express authorization from the legislature to issue such an order.

We hold that 3-5-404(1), MCA, authorized Judge Moran to issue the Order to Provide Facilities in the event the Commissioners failed to provide him with a room fit and appropriate for use as Department II's jury room.

2. Are Judge Wilson's findings of fact regarding the suitability of Department II's existing jury room, the third-floor room designated by Gallatin County, and the

second-floor space designated in Judge Moran's Order clearly erroneous?

As discussed above, Judge Wilson held a hearing on the suitability of Department II's existing jury room, the third-floor space set aside by the Commissioners and the second-floor space designated by Judge Moran in his Order. Gallatin County and Judge Moran presented evidence via testimony and exhibits. Judge Wilson subsequently entered findings of fact that neither the existing jury room nor the third-floor room designated by Gallatin County was suitable as Department II's jury room. Gallatin County contends that both the existing jury room and the third-floor jury room are adequate and that Department II is not entitled to an "ideal" jury room. Its contentions, however, do not take into account our standard in reviewing findings of fact.

## Standard of Review

We review a district court's findings of fact to determine whether they are clearly erroneous. Rule 52(a), M.R.Civ.P.; Swenson v. Janke (1995), 274 Mont. 354, 358, 908 P.2d 678, 681. A court's findings are clearly erroneous if they are not supported by substantial credible evidence, the court misapprehends the effect of the evidence, or our review of the record convinces us that a mistake has been committed. Daines v. Knight (1995), 269 Mont. 320, 325, 888 P.2d 904, 906 (citation omitted). It is within the province of the trier of fact to weigh conflicting evidence and we will not substitute our judgment for that of the factfinder on such matters. Topco, Inc. v. State, Dept. of Highways (1996), 275 Mont. 352, 362, 912 P.2d 805, 811 (citation omitted).

## Current Jury Room

Judge Wilson found that Department II's existing jury room is small in size, windowless, has no ventilation and the toilet facilities are in close proximity both to each other and to where the jurors deliberate. He further noted that the jury room is in close proximity to Judge Moran's chambers, which presents a problem for hearings out of the jury's presence, and that the room also serves as Orenstein's office and mediation room and as a storage room for files and supplies. On those bases, Judge Wilson ultimately found that the current jury room is "totally unsuitable" for use as Department II's jury room. As the following discussion illustrates, the record is replete with evidence supporting the underlying findings and Judge Wilson's ultimate finding that Department II's existing jury room is unsuitable.

Judge Moran testified that the existing jury room is very small and is extremely cramped because it contains a table, thirteen chairs, a small refrigerator, a large storage cabinet, three file cabinets, a copy machine and a computer work station. He stated that "[Department] II has lived on the edge of mistrial for many years" as a result of the inadequate jury room facilities and people who have served as Department II jurors have expressed their

dissatisfaction with the jury room. Judge Moran further testified that the jury room is only separated from his chambers by two doors, which creates the potential for jurors to overhear arguments held out of the jury's presence. He also was concerned because the jury room bathrooms are not handicapped-accessible and, therefore, do not meet ADA standards.

Judge Gary testified that the jury room is too small and is not soundproof. In this latter regard, Judge Gary had no doubt that he could have heard the jurors' discussions as they deliberated. In a similar vein, Orenstein testified that, due to the lack of soundproofing, she could hear jurors' discussions when standing in the hall outside the jury room. She was concerned about the public's ability to overhear jurors.

Several individuals who previously had served as jurors for Department II testified regarding the inadequacy of the current facilities. Sally Brown found the jury room extremely uncomfortable and not conducive to clear thinking. She stated that the most uncomfortable aspect of the jury room was the close proximity of the bathrooms and the lack of privacy. Matilda King testified that the jury room "looked like a temporary thing." In addition, there was so little space that jurors could not all sit around the table and some jurors had to sit behind other jurors during deliberations.

We conclude that Judge Wilson's finding that Department II's existing jury room is "totally unsuitable" is supported by substantial credible evidence and is not otherwise clearly erroneous.

Third-Floor Jury Room

Gallatin County proposed locating a new Department II jury room on the third floor of the Center. Judge Wilson implicitly found this proposal unsuitable in that

[t]o herd a jury to the third floor presents security problems, is time consuming, creates a problem for mixing with the general customers of the courthouse. It should be noted that the Clerk of Court's office is located on the third floor and this is a well-trafficked office in the courthouse. . . .

Again, the record is replete with evidence supporting Judge Wilson's findings regarding the unsuitability of the third-floor room proposed by Gallatin County as Department II's jury room.

Judge Moran's and Orenstein's testimony, as well as exhibits admitted into evidence, reflect that jurors traveling from Department II's courtroom on the second floor to the proposed jury room on the third floor would have to either take the stairs or proceed down a hallway used by the public, witnesses and attorneys to get to the elevator. Upon arriving on the third floor, jurors would have to walk down another similar hallway to get to the jury room. Moreover, Judge Moran testified that the elevator is

relatively small and, as a result, it is possible that two trips would be required to transport all of the jurors to the third floor.

Judge Moran further testified that locating Department II's jury room on the third floor would be unsuitable because it would expose the jury to too much "contamination, too much potential for hearing extraneous matters" and would waste time. In this regard, he generally likes to recess court proceedings every hour to allow jurors to have a ten-minute break to use the rest room facilities, refill their coffee or just get up and stretch. For some jurors, traveling to the third floor and back to the second floor potentially could take as long as ten minutes. Judge Moran was concerned that, as a result, he would have to allow jurors twenty to thirty minutes for breaks so that they could have ten minutes in the jury room; he testified that he "cannot conduct a trial with those kind of lengthy delays." Similarly, requiring a jury to return to the third floor so that motions could be argued out of the presence of the jury would waste time. Judge Moran also pointed out that jurors are often elderly or handicapped and requiring such jurors to travel to the third floor and back would be burdensome.

Judge Gary agreed that requiring jurors to go to the third floor during recesses would be inefficient and waste time. He noted that such a procedure could require several bailiffs because some jurors would take the stairs, while older or handicapped jurors need to take the elevator. Moreover, Judge Gary was concerned with the potential for jurors to easily mingle with the public; he noted that the Center is a very busy place and that the Clerk of the District Court's office also is on the third floor.

Orenstein testified that locating Department II's jury room on the third floor would be unsuitable and nonproductive. She was especially concerned that, with the number of elderly jurors who serve on Department II juries, traveling to the third floor repeatedly would be burdensome. She stated that, because Department II does not have a designated bailiff, she is responsible for escorting jurors to and from the jury room and monitoring the jury, and that locating the jury room on the third floor would make it impossible for her to properly perform that task. As a result, she was concerned with the increased potential for jurors to interact with the public.

The Honorable John W. Larson, a district court judge in the Fourth Judicial District, testified by deposition regarding his concerns about locating a jury room on a different floor than the courtroom. In his opinion, making jurors go to a different floor causes difficulties for handicapped jurors and is inefficient. He also expressed concern about security issues, particularly the increased likelihood that jurors would mingle with the public. The Honorable Dorothy McCarter, a district court judge in the First

Judicial District, testified to the same effect.

We conclude that substantial credible evidence supports Judge Wilson's implicit finding that a jury room on the third floor would be unsuitable for Department II and the finding is not otherwise clearly erroneous.

### Second-Floor Space Vacated by Sheriff

Judge Moran's Order provides for locating Department II's jury room on the second floor of the Center, directly across the hall from the existing jury room, in the space vacated by the Sheriff's office. Judge Wilson found that locating Department II's jury room in this space would alleviate the security concerns over jurors mingling with the public which exist regarding the third-floor jury room and would cost a nominal amount. Judge Wilson further found that moving the jury room across the hall would allow Department II to use the existing jury room for mediations, storage and other necessary uses.

Judge Gary testified that jurors would only travel a short distance back and forth across the hall and, therefore, it would be much easier to monitor them. He also opined that locating Department II's jury room in the space vacated by the Sheriff's office would provide Department II with much-needed extra space.

Orenstein testified, consistent with Judge Gary, that it would not be difficult to escort the jurors across the hall. Moreover, placing the jury room across the hall would alleviate the problem with the existing jury room of being able to hear the jury deliberate.

Judge Moran hired Dennis Nelson (Nelson), a contractor, to determine the cost of renovating the space across the hall from his courtroom for use as a jury room. Nelson testified that his estimate included soundproofing for privacy of jury deliberations and handicapped-accessible toilet facilities. He stated that the total cost for renovating the space would be about $21,000.

We conclude that substantial credible evidence supports Judge Wilson's findings regarding the suitability of locating Department II's jury room across the hall from the courtroom and existing jury room on the second floor and that the findings are not otherwise clearly erroneous.

In summary, Judge Wilson's findings regarding the unsuitability of both the existing Department II jury room and the third-floor jury room proposed by Gallatin County are supported by substantial credible evidence. Judge Wilson did not misapprehend the effect of the evidence and our review of the record does not convince us that a mistake has been committed. Therefore, we hold that the findings are not clearly erroneous.

Applying 3-5-404(1), MCA, to these findings mandates our conclusion that the Commissioners failed to provide Department II with a suitable jury room. On that basis, we further conclude that 3-5-404(1), MCA, authorized Judge Moran to issue an Order to

Provide Facilities. Moreover, according to its plain terms, 3-5-404(2), MCA, mandates that the expenses incurred as a result of such an order are to paid out of the county treasury general fund after being certified by the judge as correct. We conclude, therefore, that 3-5-404(2), MCA, authorized the portion of Judge Moran's Order directing that the expenses associated with the Order be paid from the Gallatin County general fund.

Gallatin County's final argument--stated briefly and without citation to supporting authority--is that Judge Moran did not have authority to designate the specific location for Department II's jury room. The statute does not directly address this matter, and we have not previously interpreted the statute. However, the statute's provision that a judge may direct the sheriff to provide suitable facilities does not contemplate returning decision-making to the very entity which heretofore has failed to provide such facilities. In addition, under these unique facts, Judge Moran's Order was not unreasonable. As Judge Wilson found, Judge Moran's proposal for the location of the jury room solves the problems associated with both the existing jury room and Gallatin County's proposed site on the third floor and requires relatively minimal renovation costs.

Accordingly, we reject Gallatin County's request that we dismiss Judge Moran's Order or declare it void and we affirm that Order.

/S/   KARLA M. GRAY


We concur:

/S/   WILLIAM E. HUNT, SR.
/S/   JAMES C. NELSON
/S/   TERRY N. TRIEWEILER
/S/   W. WILLIAM LEAPHART


Chief Justice J. A. Turnage, dissenting.

I respectfully dissent.

District Judge Wilson has erred in misinterpreting the law, 3-5-404, MCA, and has misinterpreted the evidence in this case.

From the record, it is clear that the Board of County Commissioners of Gallatin County has provided to Department 2 of the District Court, presided over by Judge Moran, suitable rooms to accommodate the needs of Department 2, including a jury room.

The problem arises because Judge Moran is determined he will not utilize the space provided by the County because it is located one floor above his chambers and courtroom. Under the facts of

this case, the District Judge's determination is not reasonable.

The jury room complained of on the second floor of the court facility is admittedly not spacious.  However, Judge Moran has determined that the jury room will be used by a court clerk who acts as a mediator in family court matters, as well as a hearing officer and clerk.  The second floor jury room has become cluttered with a refrigerator, filing cabinets, computer equipment and other miscellaneous office material which, of course, further constricts a small jury room.

Section 3-5-404, MCA, provides only that the county commissioners provide suitable rooms which, of course, includes a jury room.  The commissioners have provided such rooms one floor above the present jury room.  The new jury room is equipped with bathroom facilities that satisfy the Americans With Disabilities Act unlike the present jury room on the second floor.  In addition, next to the new jury room is a room for Judge Moran's law clerk to use in mediation of family court matters and for other hearing officer needs, including space for office equipment.  Further, the new space also provides storage areas for use by Department 2.

Judge Wilson's order finds that the new jury room and space on the third floor of the justice building is not an adequate solution.  This finding is an incorrect interpretation of the law.  There simply is no impairment of Department 2 court functions by having a jury use the new jury room on the third floor.

From the record it appears that it is not uncommon for district court jury rooms to be located on a floor other than the courtroom floor.  In all probability, in a majority of all fifty-six courthouses in Montana, courtrooms and jury rooms are located on different floors.

One must pause to consider why, in the one hundred years  3-5-404, MCA, has been in existence, Department 2 of the District Court of Gallatin County, for the first and only time, has forced a remodeling of a courthouse because of claimed unsuitable jury room space.

I agree with the majority opinion's initial analysis of statutory construction which essentially is that this Court should not add or subtract words from a legislative act.  I disagree, however, with the majority opinion marching forward to insert new language into the statute by adding the words "fit" and "appropriate".  The majority should stay with the word "suitable."

Witnesses for the respondents testified that there was a security concern because of jurors being permitted to mingle with the members of the public in the courthouse.  First, it should be noted that the respondent did not cite even one case of jury tampering as a result of such "mingling."  Jurors come into contact with the public during the course of a trial except only when they are excused to deliberate their verdict.  Except when they are sitting in the jury box, jurors go about their daily lives, come to

the courthouse, go to lunch, return home in the evenings and are exposed to contact with the public. This is the way things have always been and will always continue to be. Jurors take an oath of office not to let anyone contact them and not to contact anyone concerning the case they are sitting on. It is unfair to assume that our juror citizens would violate their oaths of office in any manner. Insofar as members of the public approaching jurors about the case in the courthouse, such felonious tampering, as a practical matter, simply has not been a problem in Montana's courthouses.

It also bears mentioning that the majority opinion's recitation that "several individuals" who previously had served as jurors for Department 2 testified regarding the inadequacy of the second floor jury room is a stretching of the record. Only two jurors, who apparently served on the same case and deliberated only two hours, testified they thought the jury room was too crowded.

However, they apparently were able to reach a verdict.

This case will, unfortunately, provide a very unsatisfactory and unneeded precedent and a background of conflict for potential troubles between boards of county commissioners and district court judges. Section 3-5-404, MCA, was never intended to allow a subjective order for remodeling, such as was handed down by the district judge in this case.

I would reverse the order of District Judge Wilson and vacate the order to provide facilities of District Judge Moran.

/S/ J. A. TURNAGE

Justice Charles E. Erdmann, dissenting:

I join in the dissent of Chief Justice Turnage.

/S/ CHARLES E. ERDMANN